In the Matter of the Arbitration between WHEAT EXPORT COMPANY, INC., Appellant, and THE NEW CENTURY COMPANY, Respondent.

First Department, January 10, 1919.

**Arbitration — submission of controversy as to quality of flour to members of flour committee of New York Produce Exchange subject to and under rules of said exchange — application of said rules relating to samples — jurisdiction of arbitrators — when award will not be modified or vacated.**

A controversy with respect to the quality of several carloads of flour which had been purchased by the appellant from the respondent and delivered at ports other than New York was submitted by them under an arbitration agreement to the " members of the Flour Committee of the New York Produce Exchange," as arbitrators, " subject to and under the rules of said exchange." The arbitrators received all the evidence offered by either party and confined their award to matters submitted to them for arbitration.

*Held,* under the evidence, that there is no ground upon which to modify or vacate the award which should be confirmed.

The provision of the contracts for the sale of the wheat and of the arbitration agreement referring to the rules of the exchange are satisfied by confining them to deliveries made at the port of New York and in so far as they relate to samples taken by the official inspectors of said exchange, they are inapplicable to deliveries made at other ports.

In the absence of restrictions in the arbitration agreement, arbitrators are not confined either by strict rules of law or evidence and the general rule is that such awards may not be set aside for either error of law or fact not appearing on the face of the award, where the arbitrators have

not exceeded their jurisdiction and have not been guilty of fraud, corruption or misconduct.

The authority of the court with respect to awards of arbitrators is confined, limited and controlled by the provisions of sections 2373–2375 of the Code of Civil Procedure.

APPEAL by the Wheat Export Company, Inc., from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 17th day of October, 1918, denying its motion to confirm the award of arbitrators herein, and also from an order entered in said clerk's office on the 7th day of October, 1918, granting the application of the New Century Company to vacate the said award.

*Victor E. Whitlock* of counsel [*Holm, Whitlock & Scarff*, attorneys], for the appellant.

*David Haar* of counsel [*Max Frieder*, attorney], for the respondent.

LAUGHLIN, J.:

The appellant is a domestic corporation, and it appears by affidavit that it was organized to administer a branch of public service carried on by the government of Great Britain in providing food for its own people and for its allies during the present war, and that in performing such service it has no competitor and makes no profit, and that one of its functions was to purchase and ship flour abroad.

It entered into six contracts with the respondent by which the latter agreed to sell and deliver to it two brands of flour, viz., " Bakerite " and " Newco," with the millers' names on the packages. By the terms of each contract the flour was to be of fair average quality of the season's shipment of the same brand and deliveries were to be made " free along side ocean steamer or steamers," and four of the contracts provided that the deliveries were to be made at the port of New York and delivery under one was to be made at the port of New Orleans and under the other one-half was to be delivered at the port of New York and the other half at the port of New Orleans. Each contract contained a provision by which the buyer was authorized to require delivery at another port, and in that event there was a provision for an adjustment

of the difference between the freight to the specified port of delivery and to the other port at which delivery might be required. The contracts together embraced the sale and delivery of one thousand carloads of flour. There was no controversy with respect to the deliveries made at the port of New York, but a controversy arose with respect to the quality of some sixty or sixty-five carloads of flour delivered at other ports. Negotiations for the arbitration of this controversy were opened between the parties and the appellant evidently submitted to the respondent a proposed agreement for the arbitration thereof by three designated persons, who were members of the flour committee of the New York Produce Exchange, but that was not stated in the proposed agreement. The respondent wrote the appellant referring to the proposed agreement, suggesting that there be inserted therein after the names of the arbitrators the words "members of the Flour Committee of the New York Produce Exchange." The proposed arbitration agreement submitted the controversy between the parties relating to the fulfillment of the six contracts without reference to any rules for the guidance of the arbitrators. The respondent in the same letter suggested that there be inserted after the word "arbitration" in the proposed agreement the following, "subject to and under the rules of said Exchange," and stated as a reason therefor that the arbitration as proposed did not show that it was to be held before the committee of said exchange and, therefore, could be considered as a request for arbitration by the gentlemen named individually and not in their official capacity. The suggested changes were made and the arbitration agreement was signed and executed by the parties.

The minutes of the arbitrators show that they met on the 21st of February, 1918, and that Mr. Piper, who it appears by affidavit was familiar with the facts, appeared for the appellant, and that Mr. Spaulding, the president of the respondent, appeared for it, and the minutes contain a memorandum signed by the parties as follows: "We agree to waive our oaths." Unsworn statements were then made before the arbitrators by Mr. Piper and Mr. Spaulding, at the conclusion of which the chairman of the arbitrators asked if there were any further questions, and there being none, the

parties were requested to retire, and one week later the arbitrators signed a formal award in writing and in due form by which it appears they made specified allowances per barrel to the appellant with respect to the flour delivered from thirty-seven of the cars aggregating $5,853.04.

On the hearing before the arbitrators the contracts were produced and it appeared that all of the flour had been delivered and the purchase price had been paid at the time of delivery as provided in the contracts. The contracts contained no reference to samples. Mr. Piper for the appellant stated to the arbitrators that the controversy was with respect to the quality of the flour delivered and that a claim for an allowance therefor had been made and refused; that all of the purchases were made on samples submitted by the respondent and retained by the appellant, which were used for the purpose of comparison and that when a sample was nearly exhausted it was renewed; that he produced samples of the two grades of flour which had been furnished by the respondent and retained by the appellant with the dates on which they were received by the appellant, and that with respect to the samples of " Newco " he produced part of the original sample, but that the original sample of " Bakerite " was exhausted and the sample he produced was part of one received from respondent on September twenty-sixth; that these samples were used in making comparisons with samples from the cars received at the seaboard and forwarded to the appellant; that he produced a trunk-full of samples so received from the cars to which the appellant had taken exception, with a list of the cars by numbers from which they were taken, and he stated to the arbitrators the nature of the business conducted by the appellant; that owing to conditions incident to the war there was necessity for prompt delivery and the port at which delivery was required could not be determined in advance, and that appellant had endeavored to keep a check on the quality of the flour delivered by securing samples through authorized sampling agencies at the ports of delivery and by obtaining official inspection where there appeared to be necessity therefor whenever this could be done during the hurried delivery of the flour and sailing of the vessels from the ports of delivery, and that in consequence the

appellant was only able to obtain samples of a small percentage of the deliveries made and that in the circumstances it was impossible for the appellant to present any definite claim for a specified amount and that the measure of damages was necessarily to be left to the arbitrators by comparison of the samples from deliveries with the standard samples. Mr. Spaulding for the respondent thereupon stated that the arbitration agreement had been drawn by the appellant, and he drew attention to a provision in each contract to the effect that it was made in view of and in all respects subject to the by-laws and rules established by said exchange, rule 13 of which provided that on all sales of flour the buyer shall have twenty-four hours from the day of sale or notice of arrival " to examine as to quality; provided, however, the flour is available for examination," and according to the minutes he stated " that there was no chance on any of these deliveries until 60 days — or an average of 60 days after the flour was received," but it appears by his affidavit that by this he meant that there was no claim made by the appellant until the lapse of the period he specified. Mr. Piper, however, in an affidavit insists that Mr. Spaulding's statement was as recorded in the minutes, and that it constituted a concession that the flour could not be inspected as contemplated by said rule 13. Respondent in its points concedes that the flour could not have been inspected as contemplated by rule 13, and it makes no claim under said rule, but relies on rule 18. Mr. Spaulding drew the attention of the arbitrators to rule 18 of said exchange, which provides that only flour inspected by inspectors of said exchange " shall be recognized by the Exchange, but this shall apply only in case of dispute as to quality or condition," and he drew attention to the fact that no sample of an inspection by inspectors of said exchange had been submitted. Mr. Spaulding at the outset made no objection to the samples produced by the appellant as not having been taken from the flour delivered, but he did object that the standard sample of " Bakerite " appeared to have been received by the appellant on the twenty-sixth of September, whereas some of the sales of which complaint was made were made on the first of that month. At this point when the discussion was concerning the standard samples the

chairman asked Mr. Spaulding whether he accepted the
samples produced by Mr. Piper "as samples representing
the flour?" and he replied in the negative. He was then
asked whether he was willing to look at them and see whether
or not he would accept them, to which he replied drawing
attention to the provisions of the arbitration agreement and
to the circumstances under which the proposed .agreement
had been modified as stated. Mr. Piper was then asked by
the chairman whether appellant had notice of the flour when
it arrived at New Orleans, and he replied that the seller
delivered the flour on board ship and then presented the
ship's bill of lading to the appellant for payment, and that
appellant had no direct official notice of the arrival of the
flour at the port, but that the British Ministry of Shipping
furnished the transportation and that the first notice appellant
received was the sample which ordinarily came after the flour
was on board and the ship had left the port and that appellant
had no opportunity to examine the flour before it went on
board. Mr. Spaulding then again drew attention to the terms
of the arbitration and the contracts, and stated that if the
appellant desired further protection it should have insisted
on contracts providing for it. The chairman then expressed
a doubt as to whether rule 13 applied to deliveries at ports
other than New York, and Mr. Spaulding insisted that by
the terms of the contracts it was made applicable no matter
where delivery was made. After further discussion with
respect to the applicability of rule 13, the chairman asked
Mr. Spaulding whether he would be willing to look at the
samples produced as standards and to O. K. them and leave
it to the committee to compare the samples produced from
the cars with them and determine whether there was any
difference. To this Mr. Spaulding replied in the negative
and assigned as a reason that he could show a laboratory
analysis of the flour in every car embraced in one of the
contracts calling for 50,000 barrels of "Bakerite," and he
gave the percentages of average color value and gluten con-
tents of the deliveries made under that contract, which per-
centage was lower as to color value by about eight points
than an analysis of a portion of the standard sample of that
grade of flour received by appellant from respondent on the

twenty-sixth of September and furnished by the appellant to respondent in January thereafter. To this Mr. Piper replied that the respondent's test as to color with respect to part of the sample of September twenty-sixth was made " after the sample had been lying in our office for four months," and that Mr. Spaulding admitted. Mr. Piper then stated that the controversy was not over any question of color, but of grade, and that the committee was called upon to make comparisons of grade where due allowance must be made for *bleaching* from month to month. To this the chairman responded, " Correct; we will make all those due allowances." Whereupon Mr. Spaulding stated that it was not a question of bleaching difference, but of wrong standards and that respondent's standard was at least eight points under the standards presented by appellant and that consequently any comparison of such a standard as against deliveries would be unfair to the respondent. Mr. Spaulding then, in answer to an inquiry by the chairman, conceded that the standard of this grade produced by the appellant was delivered by respondent but claimed that since such delivery was twenty-six days after the oldest contract was made it could not be the original sample. The chairman then suggested that the arbitrators take that into consideration. Mr. Piper then asked whether Mr. Spaulding would accept as a standard samples taken by inspectors from cars which were passed by the inspectors and accepted under the contract, and Mr. Spaulding replied that the only standard he would accept would be a standard in color and gluten content that would average according to the 50,000 barrels of " Bakerite " delivered under the last contract. The chairman then asked whether appellant had a New York inspector's sample of both grades representing shipments made under one of the contracts, and Mr. Piper replied that he had half a dozen. The chairman then suggested that the arbitrators take those samples as standards and compare the samples taken from the cars delivered therewith, whereupon Mr. Spaulding said: " These other samples are not properly drawn, are they? " and Mr. Piper replied: " You can show the car numbers and check them up on your list." After some informal discussion not reported, the chairman suggested that they proceed on that

First Department, January, 1919.     [Vol. 185.

basis, taking into consideration all the testimony received and said rules Nos. 13 and 18. To this Mr. Spaulding replied that the respondent believed that it made good and honest deliveries and that the average deliveries were well up to the standard in all particulars, but that it was possible that the appellant might have a sample from a car that might run a little above the respondent's sample, and, therefore, he would like to know where the samples came from. The chairman then suggested that Mr. Spaulding and Mr. Piper endeavor to agree on samples taken by the New York official inspectors and agree upon them as standard. Mr. Piper then asked what the arbitrators would compare with the standards if those were agreed upon, and the chairman replied, with the samples produced by appellant as coming from the cars delivered, at which Mr. Spaulding said: "I do not admit them." The chairman then suggested that Mr. Piper could doubtless furnish Mr. Spaulding a satisfactory statement with respect thereto, and Mr. Spaulding said he did not see how that would be possible, whereupon the chairman said that Mr. Piper doubtless could show Mr. Spaulding records with respect to samples produced as coming from the cars delivered. At this Mr. Spaulding said that he would like to have the arbitrators act on the information they then had and to render a decision on the facts as they then appeared. Mr. Piper then presented a letter from the appellant inclosing a list of nineteen cars and samples taken therefrom by the Boston Chamber of Commerce through its authorized inspectors. The chairman then asked whether Mr. Spaulding insisted on the arbitrators proceeding without receiving " these standards as samples," evidently referring to the standards which he had suggested that they agree upon. Mr. Spaulding replied that he thought that the arbitration should be had on the facts then before the arbitrators and on the conditions specified in the contracts and on said rules of the exchange. The arbitrators then conferred, after which the chairman asked whether there were any further questions. Mr. Piper then said that he was willing to leave the case with the arbitrators. The chairman then asked, in substance, whether the appellant could give further proof that the samples produced were the original samples taken from the cars, to which Mr. Piper

replied that the samples were put in the trunk as they were received and that many of them were in bags, with the imprint of a board of trade or chamber of commerce "or whatever it might be, that surrounded the drawing of the samples." The chairman then asked whether that showed the car numbers and all details, to which Mr. Piper replied that they showed the car numbers, but not the number of bags in every instance. The chairman then asked whether the car numbers on the samples agreed with the car numbers as shown by the invoices. To this Mr. Piper replied by stating the manner in which a record was made by appellant with respect to samples when the car was below grade, showing the numbers of the cars from which the samples were taken and the contracts under which the deliveries were made, and stated that he could give the arbitrators sheets showing those with respect to practically all of the cars, and stated, in effect, that in the course of the negotiations between appellant and respondent, respondent had offered to pay appellant ten cents per barrel on all flour delivered from these cars. At this point Mr. Spaulding said that he would accept all of these cars as having come from the respondent, and said that he could produce the letter relating to the offer of compromise to which Mr. Piper referred. Mr. Piper then filed with the arbitrators a paper which was marked for identification, but is not in the record and the nature of which is not stated. The chairman thereupon stated that the arbitrators were selected to adjust the controversy and make an award. To this Mr. Spaulding replied by referring to the conditions of the contracts and arbitration agreement, and insisted that the arbitration must be under the rules of said exchange. The chairman replied that it was within the province of the arbitrators to make an award without regard to the rules, and thereupon the hearing closed.

The position taken by the respondent before the arbitrators and on this appeal is that by the provisions of the contracts and the terms of the arbitration agreement, the arbitrators were confined by the rules of said exchange to making an award based on samples taken by the official inspectors of said exchange. Both parties knew that no such samples were taken with respect to the flour which is the subject of

the arbitration agreement, and if that contention were valid there would be nothing to arbitrate. It is manifest that said rules 13 and 18 relate to deliveries made at New York and that the official inspection is made for the purpose of determining whether the delivery tendered is a good delivery under contracts between members of the exchange. The provisions of the contracts and of the arbitration agreement referring to the rules of the exchange are satisfied by confining them to deliveries made at the port of New York, and in so far as they relate to samples taken by the official inspectors of said exchange, they are inapplicable to deliveries made at other ports. By the arbitration agreement the parties agreed that there was a controversy between them with respect to the performance of these contracts by the respondent, and particularly with respect to the quality of the flour delivered, to be arbitrated, and that controversy they submitted to the arbitrators. The arbitrators received all the evidence offered by either party and confined their award to matters submitted to them for arbitration. They, therefore, proceeded within their jurisdiction and on evidence pertinent to the submission, which was deemed satisfactory to them. In the absence of restrictions in the arbitration agreement the arbitrators are not confined either by strict rules of law or evidence and the general rule is that such awards may not be set aside for either error of law or fact not appearing on the face of the award, where the arbitrators have not exceeded their jurisdiction and have not been guilty of fraud, corruption or other misconduct. (*Fudickar* v. *Guardian Mutual Life Ins. Co.,* 62 N. Y. 400; *Halstead* v. *Seaman,* 82 id. 27; *Masury* v. *Whiton,* 111 id. 679; *Perkins* v. *Giles,* 50 id. 228; *Matter of Burke,* 117 App. Div. 477; affd., 191 N. Y. 437; *McGregor* v. *Sprott,* 13 N. Y. Supp. 191.) The authority of the court with respect to such awards is confined, limited and controlled by the provisions of sections 2373, 2374 and 2375 of the Code of Civil Procedure. (*Matter of Burke, supra.*) By said section 2373 it is the duty of the court on motion duly made to confirm such an award unless the award is vacated, modified or corrected as prescribed in the succeeding sections. The authority to modify an award is found in said section 2375. Concededly the record here presents no ground for modification. The

authority to vacate such an award is found in said section 2374, and is limited to four classes of cases, viz.: (1) Corruption, fraud or other undue means in procuring the award; (2) evident partiality or corruption on the part of one or more of the arbitrators; (3) misconduct of the arbitrators in refusing to postpone or refusing to hear material evidence or other misbehavior to the prejudice of a party; and (4) where the arbitrators have exceeded their powers or have so imperfectly executed them that a mutual, final and definite award upon the subject-matter was not made. No ground for vacating the award within these provisions is presented.

It follows that both orders should be reversed, with ten dollars costs and disbursements, and the motion to vacate the award denied and the motion to confirm granted, with ten dollars costs.

DOWLING, SMITH, PAGE and SHEARN, JJ., concurred.

Order denying motion to confirm award reversed, with ten dollars costs and disbursements, and motion granted, with ten dollars costs. Order granting motion to vacate award reversed, with ten dollars costs and disbursements, and motion denied, with ten dollars costs.